IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLY ADAMS,                )
                                            )
           Plaintiff,             )
                                            )
           v.                      )    Case No. 1:18-cv-47
                                            )
HCF MANAGEMENT, et al.,        )
                                            )
           Defendants.        )

## MEMORANDUM OPINION

Plaintiff Kimberly Adams filed this civil action after she was terminated from her position as Administrator of Bradford Manor, a skilled nursing facility affiliated with the HCF family of companies (collectively, "HCF"). At this juncture, Plaintiff's only remaining claim is a wrongful discharge claim asserted against Defendants HCF Management and her former supervisor, Paul Lieber ("Lieber"). The Court's subject matter jurisdiction is predicated on 28 U.S.C. §1332, as there is complete diversity of citizenship between Plaintiff and the Defendants.

Pending before the Court is the Defendants' motion for summary judgment. ECF No. 53. For the reasons that follow, the motion will be granted, and summary judgment will be entered in Defendants' favor.

## Background Facts[1]

---

[1] The following facts are derived from the Defendants' Concise Statement of Material Facts in Support of Defendants' Motion for Summary Judgment, ECF No. 55, and Plaintiff's response thereto, ECF No. 66 (collectively, "CSMF"). Where relevant, the Court has also drawn from undisputed portions of the evidentiary record. Unless otherwise indicated, the following facts are not contested. To the extent the facts are contested, the Court construes them in the light most favorable to Plaintiff.

1

HCF operates nursing homes in both Ohio and Pennsylvania. CSMF ¶3. Its Pennsylvania facilities include Bradford Manor, Warren Manor, and Sweden Valley Manor. Id. ¶¶ 3,4. From its corporate offices in Ohio, HCF provides human resource services to its Pennsylvania nursing homes. Id. ¶12.

Bradford Manor is a 115-bed skilled nursing facility located in Bradford, Pennsylvania. CSMF ¶1. It employs a team of approximately 135 to 140 individuals, including nursing, housekeeping, dietary, maintenance, and administrative staff. Id. ¶6.

Warren Manor and Sweden Valley Manor are respectively located approximately 45 minutes and 90 minutes away from Bradford Manor. CSMF ¶4. As a result of their relative proximity to one another, these three facilities occasionally refer or transfer residents to and among each other. Id. ¶5.

As a member of the nursing home industry, Bradford Manor is subject to the minimum staffing requirements of 28 Pa. Code §211.12(i). CSMF ¶13. This regulation requires facilities like Bradford Manor to average at least 2.7 hours of "general nursing care" for each of its residents during any 24-hour period.[2] Id. ¶¶ 13-14. Due to the difficulty of finding and retaining health care workers (particularly nurse aides), the facilities in HCF's Pennsylvania Region

---

[2] The regulation states:

> A minimum number of general nursing care hours shall be provided for each 24-hour period. The total number of hours of general nursing care provided in each 24-hour period shall, when totaled for the entire facility, be a minimum of 2.7 hours of direct resident care for each resident.

28 Pa. Code §211.12(i). For purposes of §211.12(i), "general nursing care" includes the services provided by registered nurses, licensed practical nurses, and nurse aides. *See* 28 Pa. Code, §201.3.

2

experienced ongoing challenges meeting their minimum staffing-level requirements, particularly on weekends. Id. ¶¶20, 23.

Plaintiff was hired by HCF in or around April 2014 as an Administrator-in-Training for Warren Manor. CSMF ¶30. She later became the facility's Administrator and then became a "mobile" administrator who assisted other Administrators within HCF's Pennsylvania region. Id. ¶¶31-32.

In or around the summer of 2016, Plaintiff applied for the position of Administrator for Bradford Manor. CSMF ¶34. Lieber, HCF's Regional Manager, interviewed Plaintiff but had reservations about her candidacy because he believed that her skills as an administrator were below average. Id. ¶35. Although HCF's President also expressed reservations about Plaintiff's fitness for the job, Plaintiff was ultimately hired based on the recommendation of Jeremy Monroe, HCF's Vice President of Human Resources. Id. ¶¶36-37. Monroe reasoned that, if the company did not have faith that Plaintiff could succeed as an administrator, they should cut ties with her rather than keeping her in the "mobile" administrator role – a position that HCF had created for Plaintiff. Id. ¶¶33, 38.

Plaintiff took over as Bradford Manor's Administrator in August 2016 and held the position until her termination in September 2017. CSMF ¶¶7, 39. As Administrator, Plaintiff was the senior-most manager on site at Bradford Manor and was responsible for overseeing the facility's daily operations. Id. ¶8. Lieber was Plaintiff's direct supervisor. Id. ¶¶9-10.

Maintaining resident census and ensuring adequate staffing were both aspects of Plaintiff's job responsibilities as Administrator of Bradford Manor. CSMF ¶19. To assist in determining whether the facility was meeting its staffing obligations, Bradford Manor's scheduler utilized software known as "OnShift." Id. ¶22. When the projections revealed a

3

potential staff shortage, the scheduler would notify Plaintiff and other management personnel. Id. ¶24.

To help ensure that Bradford Manor was meeting the required number of general nursing care hours, HCF authorized Plaintiff to direct nursing staff to come in and work a particular weekend, when necessary. CSMF ¶26. As an incentive, Plaintiff could request call-in bonuses for unscheduled staff, although these requests were not always granted. Id. ¶25. Another potential solution was for Bradford Manor to refer residents to HCF's other nearby facilities in order to bring the staffing ratio numbers into compliance; however, this was not always a viable solution because the other facilities also had staffing issues. Id. ¶28.

Defendants contend that, from the start of her tenure as Bradford Manor's Administrator, Plaintiff demonstrated performance deficiencies. According to Lieber, staff at Bradford Manor contacted him with issues about Plaintiff's work attendance, management style, personality, and knowledge. Lieber Depo. at 28-31; ECF No. 56 at 114-117.

On December 5, 2016, Lieber placed Plaintiff on a Performance Improvement Plan ("PIP"), with the approval of HCF's human resources department. CSMF ¶¶41-42. In the PIP, Lieber noted numerous problems with Plaintiff's performance, including leadership issues, treating staff in a rude and demeaning way, exceeding the staffing budget, and attendance issues. CSMF ¶43.

Lieber met with Plaintiff again in January 2017 to discuss the PIP, deliver her annual performance evaluation, and issue another disciplinary action. CSMF ¶44. In her performance evaluation – her third to that point in time, Plaintiff received her lowest scores. Id. ¶45. As a result of her scores, Plaintiff did not receive a wage increase for the following year. Id. ¶46.

In March 2017, Lieber, prepared another PIP for Plaintiff, citing the facility's lagging census, Plaintiff's failure to complete necessary quality reports, and staffing issues. CSMF ¶¶47, 49. Lieber did not initially present the PIP to Plaintiff as intended, because, around that same time, two other HCF facilities in the Pennsylvania Region lost their administrators. Id. ¶¶50-51, Lieber Depo. at 45, ECF No. 56 at 128. According to Defendants, Lieber held off presenting the March 2017 PIP to Plaintiff because he believed she might not be able to complete the plan successfully, and he did not believe it was prudent to have three facilities in the region with simultaneous administrator vacancies. CSMF ¶¶51-52; Lieber Depo. at 45, ECF No. 56 at 128; Monroe Depo. at 23-24, ECF No. 56 at 175-176. Because Lieber did not present the PIP in March 2017, Plaintiff was not aware of it at that time. CSMF ¶53.

In August 2017, Lieber prepared a third PIP for Plaintiff, which he initially shared with Jeremy Monroe, HCF's Human Resources Manager, on August 11, 2017. *See* ECF No. 56 at 179-181. Three days later, Lieber circulated a tentative final version to Monroe and HCF's Operations Manager, Shane Stewart, seeking their feedback. CSMF ¶¶ 55-56; ECF No. 56 at 179-188. Among the issues raised in the PIP were the facility's resident census, friction between the nursing and therapy departments, the facility's performance against budget, and concerns about Plaintiff's management of staff. CSMF ¶57; ECF No. 56 at 179-188 and 149-153. Although Lieber intended to deliver the PIP to Plaintiff during the week of August 14, 2017, his travels to Bradford were delayed, and he did not end up presenting the PIP to Plaintiff until August 29, 2017. CSMF ¶¶58-60; Lieber Decl. ¶¶3-4, ECF No. 56 at 179.

What occurred during the ensuing days is a matter of some disagreement between the parties. Defendants claim that, on August 30, 2017, Plaintiff approached Larry Yeager, Bradford Manor's Maintenance Director, and aggressively chastised him in front of a subordinate. CSMF

5

¶61. This prompted Yeager to complain to Lieber that he was tired of being treated so badly by Plaintiff. Id. ¶62. The facility's Director of Nursing, Sarah Brown, witnessed the exchange and separately reported it to Lieber, stating that she was embarrassed for her colleague. Id. ¶63. Lieber was very troubled by this incident, especially because, just one day before, Plaintiff had been counseled about (among other things) the tone of her interactions with staff members, and this issue had previously been addressed in Plaintiff's December 2016 PIP as well. Id. ¶¶64-65. Consequently, when he met with Plaintiff on September 6, 2017 to discuss her progress on the August 2017 PIP, Lieber also delivered a disciplinary action for the incident with Yeager. Id. ¶66. During this conversation, Lieber expressed his concern that Plaintiff might not survive the PIP and advised that he thought it would be better if they parted ways. Id. ¶67. Lieber suggested that if Plaintiff wanted to resign, she would be permitted to continue working through October 20, 2017 while looking for another position; however, if she did not resign, her employment at Bradford Manor would be terminated. Id. ¶¶68-69.

Defendants maintain that Lieber's actions were in response to Plaintiff's documented performance decline over the course of her employment, the repeated PIPs, and the incident with Yeager just one day after Plaintiff's most recent PIP. CSMF ¶70. They claim that Plaintiff and Lieber continued to discuss the termination of her employment over the course of the next two weeks; however, Plaintiff ultimately declined to resign and asked that she be terminated effective October 20. Id. ¶¶71-72. Lieber explained to Plaintiff that her options were to either voluntarily resign, with an effective date of October 20, 2017, or be immediately terminated from her job. Id. ¶73. After Plaintiff made clear that she would not resign, HCF terminated her employment on September 20, 2017. Id. ¶74.

6

Plaintiff presents a different version of these events. She points out that, in the third PIP delivered on August 29, 2017, one of the issues that Lieber raised pertained to Yeager's lack of follow-through with the tasks he was given. Consequently, when Plaintiff learned that a mouse had been spotted in the facility's pantry, she approached Yeager and told him in a firm voice that there were things that needed to be done. CSMF ¶61; *see* Adams Depo. at 165-169, ECF No. 56 at 52-56. According to Plaintiff, Yeager's complaints to Lieber stemmed from the fact that Plaintiff was holding him accountable for the tasks that he needed to complete. CSMF ¶62. Plaintiff disputes that she was disciplined as a result of the incident with Yeager, and she denies that Lieber ever specifically counseled her about her tone toward staff members. Id. ¶¶ 64, 66. The December 2016 PIP, she claims, centered around leadership and management issues such as getting to know the staff and visiting them in their workspaces. Id. ¶65.

Plaintiff also disputes Defendants' characterization of her September 6, 2017 meeting with Lieber. Specifically, Plaintiff denies that Lieber discussed a voluntary resignation option or that he expressed concern about her being able to successfully complete the third PIP. CSMF ¶¶67-68. Instead, Plaintiff claims she expressed her own concerns that the PIP was an impetus for her termination in that it imposed an unattainable census of 108 residents, a number the facility had never before accommodated. Id.

Most notably, Plaintiff observes that her termination occurred shortly after she expressed concerns to management, in writing, about perceived staffing violations at Bradford Manor – violations that had allegedly occurred during the weekends of August 26-27, 2017 and September 16-17, 2017. Concerning this point, the record reflects that, during the week of August 21, 2017, Scheduler Ericka Cawley notified Plaintiff and others that OnShift was projecting a staffing shortage for the upcoming weekend. CSMF ¶77. Monroe therefore

7

approved an incentive bonus for additional staff to come in and pick up hours over the weekend. Id. ¶78. The following Monday, August 28, 2017, Plaintiff sent an email to Lieber and another HCF employee stating, "Just a heads up – we did not make 2.7 this past weekend for Sat or Sunday." Id. ¶79.

A few weeks later, after working on daily census figures with Tracy Blake (Bradford Manor's Human Resources Coordinator), Plaintiff and Blake jointly concluded that Bradford Manor also had not met its staffing requirements on September 16 and 17, 2017. CSMF ¶81. When the alleged failure to meet the staffing level was again brought to HCF's attention, Blake pulled the census and nursing time-keeping records and recalculated the staffing ratios for both August 26-27 and September 16-17. Id. ¶82. After making adjustments for missed time-punches and properly crediting time that staff spent on their lunch breaks, Blake was able to confirm that Bradford Manor had, in fact, met the minimum staffing level for those days. Id.; Blake Depo. at 12-20, ECF No. 56 at 157-165; Blake Depo. Ex. 1, ECF No. 56 at 169-173. As noted, Plaintiff was terminated from her employment on September 20, 2017. Id. ¶74.

## **Procedural History**

Plaintiff commenced this action in February 2018 with the filing of a two-count complaint. ECF No. 1. In Count I of the complaint, Plaintiff asserted a claim under Pennsylvania's Whistleblower Law, 43 Pa. Stat. Ann. §1423 (2014). In Count II, Plaintiff asserted a claim under Pennsylvania law for wrongful discharge.

On July 12, 2018, then-presiding U.S. District Judge Nora Barry Fischer issued a ruling dismissing Count I of the complaint and allowing Count II to proceed. ECF Nos. 18, 19. Accordingly, only the wrongful discharge claim remains pending at this point.

8

Following discovery, Defendants filed their motion for summary judgment relative to the wrongful discharge claim. The relevant issues have been adequately joined and the motion is now ripe for resolution.

**Analysis**

Under Pennsylvania law, employment is generally "at-will," meaning that employers are free to terminate employees "'with or without cause, at pleasure, unless restrained by some contract.'" *Eaves-Voyles v. Almost Family, Inc.*, 198 F. Supp. 3d 403, 410 (M.D. Pa. 2016) (quoting *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1341 (3d Cir.1990)). A limited exception exists, however, in cases where an individual's discharge implicates a clear public policy of the Commonwealth. *Id.* (citing *Weaver v. Harpster*, 975 A.2d 555, 563 (2009). The public policy must be "expressly recognized in legislation, administrative regulations or decisions, or judicial decisions." *Id.* (citing *Murray v. Gencorp, Inc.*, 979 F. Supp. 1045, 1047-48 (E.D. Pa. 1997)). To prevail, a plaintiff "must do more than show a possible violation ... that implicates only her own personal interest." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 289 (2000). Rather, she must show "that some public policy of this Commonwealth is implicated, undermined, or violated because of the employer's termination." *Id.* As articulated by the U.S. Court of Appeals for the Third Circuit, there are "three limited circumstances in which public policy will trump employment at -will," namely: "'(a)n employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute.'" *Spyridakis v. Riesling Group, Inc.*, 398 F. App'x 793, 799 (3d Cir. Oct. 1, 2010) (quoting *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003)) (alteration in the original); *see Hennessy v. Santiago*,

708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)). "Pennsylvania courts have construed the public policy exception to at-will employment narrowly, lest the exception swallow the rule." *Spyridakis*, 398 F. App'x at 798-99 (citing Fraser, 352 F.3d at 111).

After reviewing the record and construing all disputed evidence in the light most favorable to Plaintiff, the Court finds that none of the foregoing exceptions to the at-will employment doctrine applies in this case. With respect to the first "public policy" exception, there is no contention by Plaintiff that HCF ever required her to commit a crime in the course of her employment or that it fired her for refusing to commit a crime.

With respect to the second exception, the evidence fails to support an inference that HCF prevented Plaintiff from complying with a statutorily-imposed duty. Central to Plaintiff's claim is 28 Pa. Code §211.12(i), which mandates a minimum ratio of "general nursing care" hours for skilled nursing facilities like Bradford Manor. Critically, however, there is no evidence to suggest that HCF ever instructed or otherwise required Plaintiff to violate that regulation. On the contrary, the evidence establishes that Plaintiff was expected at all times to ensure Bradford Manor's *compliance* with regulatory staffing requirements, even while HCF also imposed certain resident census requirements upon its Pennsylvania facilities.[3] To that end, HCF authorized Plaintiff to call staff members in on the weekends and, on occasion, offer "call-in pay" as an incentive for staff to pick up extra weekend hours. Plaintiff could also ask HCF to decline further admissions, which – Plaintiff admits -- the company sometimes agreed to do. Finally, HCF sometimes transferred residents to the other nearby facilities to meet staffing requirements, assuming those facilities had vacancies and adequate staffing to accommodate the transfer.

---

[3] Plaintiff admitted as much at her deposition, when she affirmed her belief that HCF wanted her to meet the required staffing levels. *See* Adams Depo. at 246, ECF No. 56 at 87.

10

There is also an absence of evidence to suggest that HCF tolerated a history of regulatory noncompliance at Bradford Manor. Rather, the undisputed evidence establishes that the facility remained in compliance with §211.12(i) throughout Plaintiff's tenure as administrator, sometimes through use of the above-referenced measures. And, although Plaintiff twice reported perceived violations of the staffing requirements (for the weekends August 26-27, 2017 and September 16-17, 2017), the record shows that Bradford Manor was, in actuality, compliant with §211.12(i) on both occasions. *See* CSMF ¶82.[4]

In her brief opposing summary judgment, Plaintiff stresses the fact that Lieber included a requirement in her final PIP that Bradford Manor increase its census from 106 residents to 108 residents, within 30 days. Plaintiff asserts that, by accepting these added residents, Bradford Manor was certain to commit staffing violations. But as Defendants point out, the ratio of staff-to-residents at any given point in time is dependent upon numerous variables, including the number of employees who are available to work, the number of hires HCF is able to make, whether call-in pay might incentivize additional staff members to make themselves available when needed, and whether the other Pennsylvania facilities can accept transfers of residents.

---

[4] Regarding this point, Defendants have submitted the testimony of Tracy Blake, who calculated the staffing ratios for the dates in question, based on census and administrative time-keeping records. *See* ECF No. 56 at 156-168. Defendants have also produced Blake's contemporaneous notes reflecting her calculations. *Id.* at 169-173.

Plaintiff argues that the question of HCF's regulatory compliance *vel non* is disputed and should be decided by a trier of fact. But this argument overlooks the fact that Plaintiff has already made a binding admission that HCF was compliant with its regulatory staffing requirements during the two weekends in question. *See* ECF No. 55 ¶82 ("When the alleged failure to meet the staffing level was again brought to HCF's attention, Bradford Manor's HR Coordinator Tracy Blake pulled the census and nursing time-keeping records and calculated the staffing ratios for August 26-27 and September 16-17, and her calculations confirmed that Bradford Manor had, in fact, met the minimum staffing level for those days.") and ECF No. 66 ¶82 ("Plaintiff does not dispute this fact."). The record also establishes that Plaintiff failed to include time that nursing staff spent on their lunch breaks when assessing the applicable staffing ratios, whereas Blake (appropriately) did include such time. *See* Adams Depo. at 218, ECF No. 67 at 11; Blake Depo. at 11-21, ECF No. 56 at 156-173.

Because two additional residents at Bradford Manor would necessitate only an additional 5.4 hours of nursing care per day, any prediction about Bradford Manor's ability or inability to meet its regulatory staffing requirement is purely speculative.

At most, Plaintiff's assertion that violations were certain to occur reflects her own subjective judgment about the HCF's ability to comply with regulatory staffing requirements while increasing its census requirements. Our Court of Appeals has predicted, however, that "Pennsylvania will not recognize a wrongful discharge claim when an at-will employee's discharge is based on a disagreement with management about the legality of a proposed course of action unless the action the employer wants to take actually violates the law." *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 328 (3d Cir. 1993); *see Smith v. Safety-Kleen Sys., Inc.*, No. CV 17-153, 2019 WL 626245, at *2 (W.D. Pa. Feb. 13, 2019) (holding that plaintiff failed to state a claim for wrongful discharge based on the allegation that he was constructively fired for refusing to engage in practices that he believed would violate the hours of service regulations issued by the Federal Motor Carrier Safety Administration); *Frederick v. Barbush*, No. 1:13-CV-00661, 2014 WL 840390, at *13 (M.D. Pa. Mar. 4, 2014) ("[W]hen an at-will employee's discharge is based on a disagreement with the employer about the legality of a proposed course of action, the employee may not assert a wrongful discharge claim unless such action in fact violates the law.") (citing *Clark*, 9 F.3d at 328).

The facts of this case are thus materially distinguishable from those at issue in *Eaves-Voyles*, a case which the Court previously cited in support of Plaintiff's theory at the Rule 12(b)(6) stage. In *Eaves-Voyles*, a nurse claimed that she had been terminated after refusing to schedule untrained registered nurses to perform a certain type of venipuncture procedure. The action which the employer required – and which the plaintiff refused to take – would have

allegedly violated a Pennsylvania regulation that prohibited registered nurses from performing venipunctures without "instruction and supervised practice." 198 F. Supp. 3d at 410. In addition, the employer's requests would have allegedly caused the plaintiff to violate a separate state regulation that required registered nurses to safeguard patients from incompetent nursing practices and that prohibited registered nurses from knowingly assisting in violation of the nursing regulations. *Id.* at 410-11. Recognizing the plausibility of the plaintiff's claim, the court in *Eaves-Voyles* observed that

> the prohibition on untrained nurses practicing venipuncture is highly specific. Rather than requiring registered nurses to exercise their judgment, the regulation expressly prohibits them from practicing the procedure if they lack "instruction and supervised practice." 49 Pa. Code § 21.12(2). As such, had Plaintiff scheduled untrained nurses to perform venipunctures, she would have knowingly aided another person in violation of the nursing regulations, thereby violating 49 Pa. Code § 21.18. Because Plaintiff alleges that she was terminated from her employment in [retaliation] for her "refusal to engage in conduct prohibited by law," *Herskowitz*, 2013 WL 5719250 at *8, the court finds that Plaintiff has met her burden in showing that her termination implicated a clear mandate of Pennsylvania public policy.

*Id.* at 411 (quoting *Herskowitz, v. City of Lebanon*, No. 1:13-cv-431, 2013 WL 5719250, at *8 (M.D. Pa. Oct. 21, 2013)).

At the Rule 12(b)(6) stage of this litigation, the Court applied the logic of *Eaves-Voyles* and concluded that Plaintiff had stated a plausible wrongful discharge claim. See 2018 WL 3388404, at *6 ("Plaintiff has plausibly alleged that she was given an order that would have required her to violate state regulations and was then threatened with termination—and, ultimately, terminated—when she failed to comply. At this early stage in the proceedings, the facts alleged in support of this contention are sufficient to support a wrongful discharge claim under the public policy exception."). Based upon the evidentiary record before the Court, however, a factfinder could not reasonably conclude that the Defendants required Plaintiff to violate 28 Pa. Code §211.12(i). On the contrary, the uncontested evidence shows that: (i) HCF

13

at all times expected and required Plaintiff to comply with minimum staffing regulations; (ii) HCF employed various measures to assist its administrators in meeting its staffing requirements; (iii) Bradford Manor had a history of regulatory compliance in that regard; and (iv) HCF's requirement that Plaintiff increase Bradford Manor's census (by adding two additional residents) was not certain to result in unlawful understaffing, given the variable factors involved in that calculus.

Nor can Plaintiff's claim proceed under the theory that HCF prevented Plaintiff from complying with a mandatory reporting requirement. Although §211.12(i) imposed a minimum number of "general nursing care" hours upon Bradford Manor, the regulatory scheme did not impose any obligation on Plaintiff to report perceived violations, and Plaintiff does not argue otherwise. Consequently, Plaintiff has not adduced evidence to show that HCF prevented her from complying with a statutorily (or regulatorily) imposed duty.

Finally, with respect to the third category of wrongful discharge claims, Plaintiff has not shown that HCF fired her in direct contravention of a statute that specifically prohibited her discharge. At her deposition, Plaintiff testified that she believed she was terminated for breaking an "unwritten rule" that staffing violations were never to be reduced to writing. Adams Depo. at 214-215, ECF No. 56 at 73-74. Plaintiff expounds on this theory in her Rule 56 brief, arguing that Lieber's final PIP served as a pretext for her termination and that, in actuality, she was fired for reporting concerns about staffing levels and perceived staffing violations.

To the extent Plaintiff contends that her termination was an unlawful form of retaliation, her theory is flawed. As a factual matter, the record belies the existence of a causal link between Plaintiff's reports about perceived violations and the issuance of Lieber's third PIP. Instead, the undisputed evidence shows that Lieber had materially completed his draft of the third and final

PIP by August 14, 2017 – a full two weeks prior to the date on which Plaintiff first communicated her concerns about perceived staffing violations. Compare ECF No. 56 at 179-186 and ECF No. 56 at 149-152. Second, even if the Court were to infer a retaliatory motive on the part of the Defendants, Plaintiff's theory still would be insufficient as a matter of law because the regulatory scheme at issue does not contain any protections for employees in Plaintiff's position that would have precluded HCF from firing her. *See* 28 Pa. Code §§201.1 *et seq.* In essence, Plaintiff's theory amounts to an alleged violation of the Whistleblower Law. But Plaintiff's Whistleblower Law claim was previously dismissed at the Rule 12(b)(6) stage and cannot serve now as a basis for relief. *See Magni v. Times Shamrock Commc'ns,* No. 3:15-cv-1177, 2017 WL 411207, at *7 (M.D. Pa. Jan. 6, 2017), *report and recommendation adopted,* 2017 WL 402981 (Jan. 30, 2017) (finding "no legal support for the proposition that an alleged violation of the Whistleblower Law . . . can support a separate and parallel claim for wrongful discharge under state law").

## Conclusion

Based upon the foregoing reasons, Plaintiff has failed to demonstrate that any genuinely disputed issue of material fact exists relative to her wrongful discharge claim. Because that claim is unsustainable as a matter of law, the Court will grant Defendants' motion for summary judgment.

An appropriate order follows.

SUSAN PARADISE BAXTER
United States District Judge